Alright, the court is now in session. Please be seated. The clerk, call the next case, please. Case number 316-0162, Imel Benzakry and Imel Nitzanz Al-Fawzi, appellees cross appellants by Dale Baig v. Puresh Patel and Shalfita Patel, appellants cross appellees by Alexander Loftus. Thank you. Mr. Loftus, good afternoon. Good afternoon. May it please the court, counsel. Fraud requires proof by clear and convincing evidence of reliance and proximate cause, neither of which were presented at trial, neither of which were presented in response to a motion for summary judgment. There's multiple elements to fraud, it's not just a lie. There were two glaring errors at trial that necessitated a retrial. One way or another, this is going back based on these two errors. First, there was evidence introduced without foundation, as in basic foreign book stuff in our rules. The second one was the jury was allowed to hear an equitable claim. Those two errors necessitated a retrial. However, we don't need a new trial. We can get back on two issues on de novo review. First, on the fraud claim, both on summary judgment and at trial, there's no evidence of reliance presented. That element is missing from the proofs. There's also no evidence of proximate cause. And then on a manifest way to the evidence standard, the veil-piercing claim was heard by the jury. There wasn't sufficient evidence to meet each of the elements of that claim. I want to start with the trial errors. There was a stack of bank records about two inches thick published to the jury without foundation. Let me ask you this. Where did they get those records? I don't know. So they weren't produced in discovery, so maybe through a subpoena to the bank or something? That is my assumption. I came into the case, my firm came into the case, and I came in later. Correct. The hard for these records is tremendous. You can't prove the veil-piercing claim anyways, but you definitely can't prove it without any evidence of the finances of the company. The bank records themselves are extremely prejudicial because they show millions of dollars flowing in and out of an LLC, funding a horse farm and funding other businesses. They're all part of that LLC. The juries love to sit with during deliberations. This is basic, basic evidence, hornbook stuff, that if you have a business record, then you have to have someone from that business to lay a foundation for it. That's one way. I don't see any other way this can be introduced because there's no one to testify that these are kept in the ordinary course of business. Mr. Patel didn't testify. Well, the other side can't admit the authenticity of the document, right? We could, but we didn't, and we objected. No one can testify as to when the record was made, and then no one can testify regarding the equipment used to keep it. This is basic hornbook stuff that if you affirm that ruling, you're going to change how we litigate cases in Illinois. This is slippery slope because if you have a PI client coming, if you're a PI trial, and you say, oh, well, I went to the doctor, and the doctor took these records of my care, and I saw him take the records, so let's admit the records. Or in a debt collection case, there's always an issue of getting someone in from the company to affirm the documents and the bills. It would be at the same time the debtors say, well, these are my bills, I know they're my bills, and it's sufficient. Neither of those things work. If you affirm this decision, you have your opinion affirming that, then both of those hornbook basics of trying a case are out the window, and then all sorts of evidence can come in without foundation. Moving on to the second clear error trial is with courts of equity or courts of law. Juries do not hear equitable claims. Isn't there a case law that says a judge has the discretion to submit an equitable claim to a… for an advisory opinion, but not to be decided by the jury? Who ultimately entered the judgment? The judge entered the judgment on the verdict. He did not enter a separate…he didn't make a separate finding. There's no indication he used it as an advisory jury. He just simply entered judgment on the verdict. There's no law in Illinois that supports a jury hearing an equitable claim. There's plenty of law affirming that bail piercing is an equitable claim, including Supreme Court, U.S. Supreme Court precedent, and Punto v. Bangor, which I cite in my brief. The harm of this is that when you lump in the equitable claim here with the law claim, is the evidence necessary to prove the bail piercing is extremely prejudicial and irrelevant to the fraud claim. See, the whole history of the business all coming in, including multiple bankruptcies, which is very prejudicial, all the financial records coming in, other failed businesses coming in, all of this gets dumped into the jury's lap, which has nothing to do with it. The judge's job is to separate out the equity in the law claims. Like I said, this was not an advisory jury. There's nothing in the record to support that. Nothing can be done on appeal to correct that, to say, oh, well, this is advisory. It is completely clear in the record there is a jury verdict in favor of piercing the bail. And again, huge slippery slope problem here, because if we are able to litigate this complex, messy issue of bail piercing with juries deciding that fact, it's going to erode the corporate structure in Illinois, because you can just get a jury angry and pierce the bail, and that doesn't seem fair. The whole idea of corporate fornalities does not seem fair. It's not right. It's not nice that you're able to escape liability through a corporation. But if we let juries decide that issue, it's very dangerous for all businesses in Illinois. Moving on to the merits of the claims. Did you find any case law in Illinois that said it was a reversible error to submit an equitable claim to a jury? No, because nobody's done it. There's no case where an equitable claim, when up on appeal, is submitted to a jury in Illinois. This is something you don't do. This is pretty fundamental. Or if they did do it, nobody appealed. Fair enough. If we start doing it, it will be a very different practice. Frankly, it will be a lot of fun. I'm usually a plaintiff's lawyer, and I can have a great time making juries do crazy stuff, but that is not the point of our judicial system. The point is that we have courts of chancery for a reason, because there are complex, nasty issues that aren't necessarily fair that are decided by courts of equity, and that's why we have a division. We have separate divisions in most courts, and there's a reason for that. We've been doing it for a thousand years of separating law and equity, so there's a reason for that history. Moving on to fraud. You can't prove fraud just by proving somebody used alternative facts. That alone is insufficient. You have to prove reliance on proximate cause. This is, again, corn book, basic stuff on proximate cause. You compare this to the second case I read in law school, Paul Stratton. A guy gets a raw deal on a real estate transaction. The foreseeable proximate thing is that he loses some money, and he sells somebody else for a loss. It is completely outside the realm of reality that, as a result of a real estate transaction going poorly, that it is then seized by the police because someone's selling drugs out of it. The gap here, and again, just looking at it through the Paul Stratton lens, it just doesn't work. You have somebody buys a gas station with a bad tenant, and he ends up with no tenant. He comes in from California to run it himself. He doesn't know what he's doing about running a gas station. He doesn't try to resell it. He doesn't try to find a new tenant. Instead, he decides to turn it into a clothing store, but that doesn't work, so he turns it into a head shop, and then once it's a head shop, then the head shop manager starts selling drugs, and then he gets busted for selling the drugs, and then he gets confiscated by the police, and now he owes money for that. It's crazy. In the meantime, he ripped out the pumps for the gas station. So the basics, the fundamentals of proximate cause here just don't allow for that. This is not foreseeable. There's no way you could expect, just as in Paul's draft, if the guy dropped the fireworks at the other end of the station, that's a lot more foreseeable that that would cause the lady to get scared at the end of the platform, as it would here, to have all of this cavalcade of woe happen to Mr. Ben-Zachary. It's just speculative and barely possible. Ben-Zachary himself, in cross-examination, blamed the failure of the business on bad equipment. They didn't take credit cards, the pumps didn't work, which has nothing to do with his claims. You have unregarded testimony that after the tenant leaves and everything goes, then Patel offers to buy it back for $500,000. You have testimony that somebody else is willing to purchase it prior to that for greater than $530,000. So, again, it doesn't connect at all. The other issue with fraud is, and again, proved by clear and convincing evidence, is there must be reliance. There wasn't a whiff of evidence of this on the summary judgment stage, neither on the proximate cause or on the reliance issue. His admissions, Mr. Ben-Zachary's admissions on cross-examination, just killed the case, and it should have ended on a directed verdict. Ben-Zachary admitted that the length of time that Paresh Patel personally was acquainted with Singh had no bearing on whether or not he could pay rent. Ben-Zachary admitted that Patel had made no representations to Singh's ability to pay rent or run a gas station. Ben-Zachary admitted that whether Singh managed two or four gas stations for Patel did not matter so long as he managed the stored issue. Ben-Zachary admitted that it didn't matter how much gas was sold so long as the tenant failed to pay rent. Ben-Zachary admitted he had no knowledge of Singh's credit history. Ben-Zachary admitted he had no knowledge of Singh's history of paying rent on this property. Ben-Zachary admitted he had no knowledge of Singh's history to pay rent on other properties. I mean, how do you have reliance if you admit you don't know any of these things? This is not the case that he didn't know those things because he wasn't told. He asked. He sent out interrogatories looking for information. He did not ask those questions. He asked, how long did you know him for? And the response was, I knew him for much longer than the truth actually was. He asked whether he managed the store before. And his response was that he did manage the store for several years, but in fact he did not. And that was false as well. And that was what? False. So the admissions that he made is that the false statements he received didn't matter to him. If he admits the false statements didn't matter to him, then there can be no reliance. Second, there's a non-reliance clause in the contract at issue here. And the non-reliance provision states this contains the entire agreement. There are no other terms, promises, or statements or representations. And he signed that agreement. And that was after the alleged statements occurred. And this is, again, just basis of contract. Why do you include these non-reliance provisions and incorporate everything into the deal that it's committed to writing? If when he's committing that to writing, he could have added a term and said, well, I'm basing it on these representations. But he didn't. So these are just basic elements of fraud. You've got to prove each element. And if you can't, then you don't prove fraud. A lie alone, an alternative fact alone, is not fraud. There are multiple elements to the claim. That's how he defended it. Let's go to the veil piercing. Now that one, if you want to manifest away the evidence standard, they didn't hit any of the elements for their proofs. There's no evidence about any of the corporate formalities, about how everything was managed, about the operating agreement, the shares that are held. On page 31 of my brief, I detail each point. It's necessary to prove. And there's just a complete absence of evidence at these points. Instead, what there's evidence was is a commingling of funds. But the commingling of funds is all businesses that are owned by KAP Investments. So KAP Investments has some other store or, I believe, a restaurant and a horse farm. And so a trial evidence is presented, well, they're commingling the horse farm and the gas station. Like, yes, because those are both owned by KAP Investments. Finally, another important point that was completely missed at trial, and it warrants a direct verdict finding, and you can find it on the de novo standard, is there must be a nexus between the corporate formalities and the harm. Meaning that in order to find Pearson's corporate veil, Benzac would have to come into the deal and base his willingness to go into the deal with Patel on his personal finances and know that Patel personally has some assets. And then based on that, he goes ahead and enters into the transaction with the LLC and is harmed as a result of the LLC not, in fact, being able to satisfy the debts. That's discussed further on page 33 of my brief. Well, we often see Pearson corporate veil in collection proceedings after a verdict, right? Yeah. You go in there and you're trying to collect from Mr. Defendant and you say you figure he's got his assets swirled away over here in some corporation. You should try to pierce it for that reason, correct? Correct. Anything further? So I just want to make clear that fraud cannot be proved without reliance. Benzacri admitted he didn't rely on the lies, so there can be no fraud. Fraud requires proof of proximate cause. There was no proximate cause here. Poor Mr. Benzacri made a horrible decision after he lost his tenant and spiraled into a spin of despair that is completely unforeseeable and there's absolutely no causal connection. And this is something, this is where, you know, from entering an angry verdict. Thank you for your time. Thank you. Good afternoon. Thank you, Your Honor. May it please the Court. Mr. Lawfus. As the Court well knows, this case before you concerns an appeal and a cross-appeal. The appeal begins with a statement of facts that is woefully inadequate. We point out in the very beginning of our reply brief that the statement of facts that was produced by the appellant in this case is miraculously characterized as a statement of arguments that attempts to support their contentions. And we believe that the Court should strike their statement of facts under Rule 341H6. And we point that out at the beginning. We then also give the Court the opportunity to have a better statement of facts, citing to the record. And so on pages 1 through 11, we elaborate on our brief, the appellee's brief and brief of cross-appellants. We, on pages 1 through 11, set forth the facts, citing continuously to the record of what actually happened here. And what did happen here, as described in the statement of facts, was that Mr. Benzacchi came here to the United States with nothing. He worked various jobs. He had a brother here. He eventually owned several consecutive businesses in the San Francisco area. When he was of retirement age, he sold the last of his businesses. He sold the expensive house he had because he didn't have a retirement otherwise. He had very minimal Social Security. And he looked around for a place to invest those funds. And one of the things that he was looking for was the type of investment where you invest the money and then you have a return, similar to an annuity in a way. So he had been looking for, he testified, nine months to a year, quite some time, and was looking at Exhibit 16 on LoopNet. Exhibit 16 is what Paresh Patel put out for Cap Family Investments, although at the top it has another LLC name, and it does say Contact Kapita Patel. But in large print, triple net lease or triple NL lease, gas station located in Rock Falls, one million gallon plus annual sale, followed by like 12 exclamation points, $300,000 inside C-Store sales, a bunch of exclamation points, 13% cap rate. This is the type of thing that Mr. Banzaki was looking for to put 90% or so of his life savings. And so he looked at this and he contacted a broker in the area, and the broker began to ask some questions that Mr. Banzaki was interested in. Well, okay, and these are Exhibits 25 and 28. These are emails from Mr. Levin, the broker, asking questions that Mr. Banzaki has prior to the sale. Who is this Sing and Sing LLC? Because Mr. Banzaki testified on numerous occasions throughout the record, and they are cited in my brief, that the most important thing to him was the strength of the tenant. He was 65 years old. He wanted to invest the money, have the tenant do the things the tenant was supposed to do, and he was supposed to receive his, according to the lease, $6,000 a month rental. Why did he invest in this? Because he then asked, who is Sing and Sing LLC? Oh, that's a newly formed LLC. Well, and that is the former manager of my gas stations. Turned out on the record that's not true. Mr. Sing was never a manager of any of Mr. Patel's gas stations. He was an errand boy for a couple of months running back and forth from Sugar Grove to Rock Falls and occasionally to LeClaire, Iowa. Mr. Patel says, this manager, he has over 10 years of experience in managing gas stations. Not true at all. He had no experience. He was operating the Rock Falls gas station ever since I bought it in 2005. Not true. He admitted that was not true. He also managed my other store in LeClaire, Iowa. Not true. And in Chicago. He had to admit he never had a store in Chicago. Sounds better to have three than two. If you look in the record, just for some levity, you can see his attempt to make the two into three by dividing the convenience station in LeClaire than he had a gas station in the McDonald's into two. That made three. It's kind of interesting. I've personally known him for the last eight years. Not true. Eight months. This was the husband, the unemployed husband of Kapita Patel's hairdresser. That's how he got to, that's how he was introduced to Mr. Singh. He needed someone to run back and forth. Eight years. It was eight months. He claimed that later that was a typo. Now, he then goes on and says, since I knew him personally, this was right after eight years, I did not ask for a personal guarantee on the rental payments in my purchase agreement. So that's Exhibit 25. So there are some more questions that come in. As I mentioned earlier in the email, I know Mr. Singh personally for the last eight years and have worked for me for the last five years. All of these, virtually everything that he said was a lie. Did your client testify that he didn't rely on Mr. Singh? Well, if you look at the internal record, this was an elderly man whose first language was not English. Throughout the record, there are numerous parts of the record where he does testify, yes, it was the strength of the tenant. In fact, he said, Mr. Loftus asked him, does it make any difference how long you know him? And he brings it up on cross-examination. In actuality, Mr. Ben-Zachary testified, well, of course. If this man has been managing this gas station for five years and he's willing to sign his name to a lease and a personal guarantee, he must, and there's $30,000 inside sales, he does the math on the million-dollar gallon, he said, and he testified, he can pay the rent. And that's when he ultimately signed the deal. So in addition to a vastly distorted statement of the case, there are basically four arguments that the appellant makes. The first argument is, well, you should have granted my motion A of E. Take it out of the hands of the jury. The law is that it has to be so overwhelmingly favoring the move out. You read this record, that's not the case. That is not the case. The jury sat there and listened to Mr. Patel try and run rings around these lies. Let me add, what about the bank records? The bank records, Your Honor, were produced by Mr. Patel in his personal bankruptcy where I denied him a discharge and summary judgment in Joliet Federal Court. They weren't produced in this lawsuit? No, they were produced by Mr. Patel and then they were provided to counsel. And in the record, you will find that there were numerous questions of Mr. Patel, and he noted the various, he admitted the various, he didn't call them NSF checks because they were electronic. But after a lot of questions of Mr. Patel and his knowledge that this was his account, Judge Hoffman did say, yes, I decided that this man knows that these are his bank records, he's testified about them, and that was enough for the court to let in. Let's suppose, Your Honor, let's suppose that this panel says, you know what, we don't like that exhibit 20. We don't like those bank records. Let's take those bank records out of the picture here. Well, guess what? You're still left with this elaborate fraud. He brings in the stooge tenant, Mr. Singh. He gets him to sign this lengthy lease. Mr. Singh admitted a trial. He came to trial. The jury saw him. Mr. Singh admitted I was basically a stooge I got taken advantage of, too. And then we brought in the Luke Oil Company guy, Alvin Barnacle. He testified that, and this is also in the record, he testified that we thought they'd do $400,000 a year. Mr. Schreiner, who's owned a business, a gas station very close to there for 50 years, he keeps a log. That log's in there. In 50 years, the only time he ever noted a gas war where they were selling under cost was when the patels ended in July and August. And for $30,000 or 30,000 gallons a month, it goes up to 80, 90, 150. Why, Mr. Barnacle, would someone do that? Do they like to sell under cost? Ultimately, the answer was, well, some people puff up their sails when they're trying to sell a facility. So I think the NOV standard is improper. Now, I'm going to admit to you, I think the weakest part of my case is the argument against me that guy, Judge Hauptman, let the piercing of the corporate veil go to the jury. Well, he had a number. The jury was sitting there with, like, 12 counts. There were 12 counts in this third amended complaint, improperly labeled by an associate in our office, fourth amended complaint. Third amended complaint, 12 counts. You go through a three-day jury trial. The judge has discretion to decide if that count should be heard by a jury. In fact, the law says if the facts are so intertwined that you're not going to pull them apart. There's case law, and I cite it in my brief, that the court can allow that. That's pages 17 to 22. I discussed that issue. Does it have to be an advisory jury? No. There is no case, as the judge pointed out. There's no Illinois case that says, oh, gosh, judge, you let a jury hear an equitable count, among a whole bunch of other counts that are clearly legal in nature, and that we're going to now send that issue back. When they're so intertwined, the judge who has sat there through the course of the trial is in the best position to determine whether or not the jury should hear that count. There was a clear exercise of discretion from the transcript. I think there was a clear exercise of discretion. He thought about it. This was briefed. Now, there's one other issue on that I'd like to point out. This fourth amended complaint was filed in November of 2013, following an October 2013 hearing on a motion to dismiss. And we were allowed to amend our complaint in that hearing to add that count. That was in October of 2013. That was filed in November, and the answer was filed in December of 2013. We then come to a jury trial. Do we hear a peep from the defendant? Motion to sever. Not one word. Three trial conference, got to sever this judge, not one word. I think that's a waiver. I don't think that you can just wait for two years after that and then bring it up. So that's another separate argument that I do make in my brief. In addition, they have to show prejudice. They didn't show any prejudice for these records. There's a ton of other things that Mr. Patel said and did. The jury saw, oh, the Kaff family filed a bankruptcy. Horsfarm filed a bankruptcy in foreclosure. Judgment over foreclosure is in there. This business failed. The LeClaire business was sold. Their restaurant failed. The jury heard all of these things. I think that we covered, and I point this out in the brief on page 44, I think we covered factors 1, 5, 6, 7, 8, 11, and 12. So, in addition, reliance throughout the transcript. Mr. Benzachry is saying, I really want him to know about this tenant. And if this guy has managed this and knows what it does, that's the most important thing. And the fact that Patel is vouching for him. There's isolated cases in here. You don't have to go in a business context and measure each and every one of the representations and test it. Is that a misrepresentation? Is that a misrepresentation? You may rely on those things unless you have some input and notice that they're wrong. He had none of those things. No evidence of damages, he claims. Pages 28 to 34, I discussed that and the fact that the jury heard a lot of measure of damages. And this tenancy, actually, right about now, 10 years later, at $6,000 a month when it paid $72,000 a year, that's $720,000 for his $500-and-some-thousand dollars. That's a 13% cap rate. That's why he was interested in this. That's why he did it. It was all an elaborate lie, and poor Mr. Singh got sucked into it, as did Mr. Ben-Zachary. So all that was an answer to questions of facts from the jury. The Novander case, the S.K. Handtool case, 1996. I think Novander is a third district case from this court. I said that in the brief, I believe, on page 26. S.K. Toole, Handtool in 28. It's the value of the tenancy. It's the value of the tenancy, the damages. And thank you, Your Honors, if you have any questions. Yeah, there's five minutes and five minutes, I think. Thank you. You can't unring the bell on any of this. The amount of evidence that came in as a result of combining the claims and as a result of business records coming in, it's impossible to forecast what that would change with the jury. Here we have a very interesting result of $700,000 plus the bail piercing. We cannot measure that harm for certain. We know they've received evidence they shouldn't have received. The only cure to that is a new trial. On the bail piercing, what particular evidence came in that would prejudice your client on the fraud claims in light of all the other? All of their other businesses failing, multiple bankruptcies, and then all the income from the other businesses. Couldn't that come in on the fraud claim as evidence of motive for an event? I disagree, and I would have objected to trial, and we'd have to see what would happen in those objections. I would have objected to relevance of any of that coming in, and then the trial judge would have to rule on that, and we can't do that now on appeal, so we've got to go back and try it again. You're right. Creates a lot of issues. It's a whole different trial if they're separate. Did you move to sever? I did not move to sever. At the instruction conference, this issue was raised. We, about separating these issues out, before any evidence had come in relative to these two things, at the instruction conference, Mr. Hockey presented a case that stood for the proposition that he said there was a jury trial allowed in that case. This is on the record. I said, well, if he has a case that they allowed a jury trial, then I guess I can't fight that. I disagree. It turns out that case does not. How can you fight it now, then, if you acquiesce them in the trial? Because the case doesn't say that. Well, it doesn't matter. If you agree with it, you can't. I can say that if you acquiesce. Let me finish while you talk. If you acquiesce in something, a trial, and engage in something, and say, judge, go ahead and do it, whether you're misguided or not, you can't then come back and say the judge was wrong for letting me do this. I agree. And if I had phrased it that way, I would have a problem. If you review the transcript, it's all in the record, and instead what was communicated was I have a case that stands for this proposition, this proposition is that, and that's what the case says. And I said, well, if the case says that, then I don't have much more to argue. That is insufficient to amount to a waiver. It's all in the record. You can take a look at it. If it's not a waiver, it's acquiescence. In other words, you didn't move to sever, right? I did not move to sever at any point. Okay. And I'll come back to that. Regarding when the bank records were produced or not produced, there's absolutely nothing in the record, and that is all the court can base their ruling on is what is in the record. There's nothing in the record regarding when those documents were produced or how they came to be in Mr. Hockey's possession. There's nothing in the record regarding them being produced in the bankruptcy. There's nothing in the record showing how they came from the bank or whether they were created by Mr. Ben-Zachary. There's nothing in the record for that. What the record has is that there are some bank records that appear. We don't know where they're from, and they're presented as testimony with no one to give foundation for them. And this is... Did your client testify about them? Did he ask questions about them? Yes. Was he looking at them in trial? Yes, but he did not create them. I understand that, but did he say, gee, I don't know, these aren't my records. He said that some of those look familiar, but he did not create the records. And if you affirm this, you're creating new law in Illinois. This is a...we'll take it up to the Supreme Court. We'll have a great new law. It'll make it a lot easier to try cases. But this would be way outside of precedent in creating new law. I want to go back to addressing the cross-appeal. You have one minute. Can I get an extra minute for the time we spent working with each other? Yeah, you can have a little extra time. On the consumer fraud claim, a gas station is not merchandise. This is basic. Real estate is not merchandise. The statute specifically provides that this only applies to merchandise. And when it details what merchandise is, it specifically defines real estate not located in Illinois. And basic statutory construction provides that if it says something specifically, real estate not located in Illinois, that means the real estate that is located in Illinois is not merchandise. And therefore, the consumer fraud act does not apply. A meal and sons are not consumers. There's testimony trial regarding that this is bought for an investment. And when it's being purchased for a business purchase and they're not consumers, it's provided for the statute. With regard to the post-trial amendment to allow an agency claim with a wipe, this was after the trial had already conducted, after way too long years of litigation. And then the statute of limitations had already expired as to another claim against her for fraud on agency theory. Back to basics. There are two glaring areas in this trial that if affirmed will create new law, new precedent in Illinois that will drastically change how we try cases, both equity claims in front of a jury and getting bank records in without having someone from the bank. This is basic stuff that if you affirm that, it's going to change the law, it's going to change what cases are done in the third district and throughout the state of Illinois. Fraud isn't just a lie. Arguing loudly that it's a lie and it's a dastardly lie is not fraud. You have to prove other elements, approximate cause, reliance, materiality. Without proof of those other elements, you have a lie. It's immoral, it's bad, it's wrong. It's not fraud under Illinois law. Thank you. Thank you. Mr. Hawke, is it Hawke or Hawkey? Hawkey. Hawkey, sorry. Black Hawks. Your Honors, this, the idea of this directed verdict is very, very disturbing. Thank you. We had two days of jury trial. We, Mr. Loftus and I, worked via email from, I don't know, 9 to 11.30 in jury constructions, the night before the third and final day of the jury trial. I don't know what time in the morning my phone went ping and I see a motion for directed verdict. Arrived in the jury trial the next morning, beautifully typed motion for directed verdict. Have we heard this before? It's one of the questions, Judge Hauptman, because he wants to knock out the consumer fraud counts. Well, actually, he had heard it before. He had heard it in October, and this is in the record, 2013, when Mr. Loftus' firm brought a motion to dismiss based on the same argument and the same exact case law, and Judge Hauptman ruled against him, saying, yes, back in before the amendment to the Consumer Fraud Act, you had to show this and that, these things. If you look, the cases that he cites are before the major change in the law. It was an incorrect. So he was correct in October, 2013. Then the morning of the third day of trial, same language basically comes in. Now, in addition to the October, 2013, in a pretrial submission. Because of the case, it doesn't matter what he did before. Those are interlocutory orders, so the issue for us is, was he right in granting the directives? Yes, and he was, and you're right, those are interlocutory. It could be, but he was wrong. He was right in October of 2013. He was wrong in the morning of trial. We went full bore for those three days of trial, and the judge isn't perfect. He was wrong on that. He was wrong to knock those two counts out. If you look at my argument in the brief, you will see on pages 48 through 50, the cases that show, since the statute was amended, it indicates a decisive move on the part of the Illinois legislature to enact broad, protective coverage of consumers from many types of deceptive or unfair selling and advertising techniques. And it applies to real estate. It applies to this type of transaction. It applies when you blast email from California on LoopNet all around the country. Mr. Patel testified. He knew that people would rely, and he knew that Mr. Ben-Zachary was relying on these statements. So, I think it was simply wrong. And that, by the way, knocked out all the attorney's fees, too. Second question out of the jury's mouth was, well, how do we avoid the plaintiff's attorney's attorney's fees? Oh, gosh, well, we knocked out those two consumer fraud counts. Those should, on this record, should be reinstated, and judgment should be added on those counts. And the only remand that we need, if we're going to have anything, and Mr. Ben-Zachary is still alive, is a remand on attorney's fees on the consumer fraud counts. Counsel has one minute. I would direct the court to my brief. It's much better written than I can speak. I know we're granted oral argument, and we do the best we can here. The second one was, I did file a motion to conform the pleadings to the proof. I'm criticized for this after the trial. Every motion to conform the pleadings to the proof comes after trial by definition. I mean, come on. So is this a big surprise in the third amended complaint, that the wife of the who threw out every piece of litigation? Oh, talk to my husband. He's the guy. I don't know anything. I don't know anything. He did it all. Presh Patel dealt with all the buyers, all the sellers, all the vendors, every oil company, the bank, everything. But Kalpita Patel, she signed the articles of organization. She signed the lease. She signed the sale agreement, and she let him do everything. And I say that that is a principal-agent relationship. And so that is the second part of our cross-appeal, and I would ask once again the court to carefully consider our written briefs, including our reply briefs to what's been submitted by the defendant. Thank you very much. Further questions? Questions? Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in recess until 9 o'clock tomorrow morning. Thank you.